UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


LYNDA REDDY,

                **Plaintiff,**                        **Case Nos. 2:09-cv-1152**
                                                            **2:11-cv-879**
        **-v-**                                   **JUDGE SMITH**
                                                      **Magistrate Judge Deavers**


JPMORGAN CHASE BANK, N.A., *et al.,*

                **Defendants.**


**OPINION AND ORDER**

       This employment discrimination action is before the Court on Defendants' Motion for Summary Judgment (Doc. 78).  This motion is ripe for review.  For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

**I.**       **BACKGROUND**

       In January 2007, Defendant JPMorgan Chase Bank, N.A. ("Chase" or "Defendant") hired Plaintiff Lynda Reddy to work as an "Operations Specialist" in the home equity loan department. Nicole Lafayette, the hiring manager, interviewed and selected Plaintiff for the position.  In her role as an Operations Specialist, Plaintiff was responsible for processing loan payments made in check form and helping to arrange recurring automatic electronic payments for customers (Automated Clearing House "ACH" processing).  As to payments received via the mail, Plaintiff was required to open the mail, keep track of the checks, and apply the payments to customers' accounts.  The work of Operations Specialists is evaluated for accuracy to ensure compliance with rules, regulations, and standards applicable to financial institutions.  For example, to meet

these obligations, Operations Specialists must correctly input information, such as bank routing numbers and payment amounts. A failed attempt at correctly setting up the electronic payment process for a customer would qualify as an "ACH error," and an incorrectly processed payment would be labeled as an internal transaction adjustment ("ITA") error or "balancing error." During Plaintiff's tenure as an Operations Specialist, Chase management expected Operations Specialists to have no more than 12 ACH errors or 3 balancing errors in a calendar year.

### A. Plaintiff's Performance in 2007

Between January and March 2007, Lafayette was Plaintiff's direct supervisor. Stacey Dean began to supervise Plaintiff around March 2007. Plaintiff's performance issues during the first few months of 2007 were addressed through Plaintiff's discussions with Lafayette. For example, Lafayette met with Plaintiff to discuss the discovery of a customer check, which should have been processed by Plaintiff, found in the trash. Lafayette gave Plaintiff a verbal warning, and Plaintiff took steps to make sure such a mistake did not occur again. Plaintiff had other processing errors during 2007. Plaintiff's October 2007 performance review, which was completed by Dean, indicates that she had 7 ITA errors between January and October 2007, more than double the amount of balancing errors permissible under Chase's standards. Dean noted that Plaintiff generally demonstrated good leadership within her team despite on occasion being abrupt or unnecessarily loud. Dean rated her overall performance as "meets expectations." (Doc. 75-1).

### B. Dean's Performance Meetings

In about January 2008, Lafayette advised Dean to conduct regular one-on-one meetings with her direct reports to discuss any performance issues. Due to heavy workload early in 2008,

2

Dean began holding these meetings in April 2008.  On April 3, 2008, and after obtaining a return report showing errors for the first quarter of 2008, Dean met with Plaintiff.  Dean informed Plaintiff that 48 ACH errors attributable to her were listed on the return report for the first quarter of the year.

After Plaintiff's April 2008 meeting with Dean, Plaintiff informed Lafayette that several of the 48 ACH errors should not have been attributed to her.  Lafayette investigated the matter and determined that errors attributable to Plaintiff and the other Operations Specialists on Dean's team had been overstated due to Dean not properly verifying the error information on the return report.  As it relates to the errors attributable to Plaintiff, Lafayette determined that some of the ACH errors were duplicates, some were errors made by other Operations Specialists, and some could not be verified.  Based on her review, Lafayette verified that Plaintiff actually had 29 ACH errors during the first quarter of 2008.  Even though this number of errors far exceeded Chase's standards for acceptable performance, these errors were not used in any manner to evaluate the performance of Plaintiff, or any other Operations Specialists on Dean's team, due to the concerns raised regarding the accuracy of the return report.  Lafayette changed the review process to require the full investigation of errors listed on the return report before they could be counted against an Operations Specialist.  Lafayette thanked Plaintiff for bringing the issue to her attention.

### C.      Dean Makes Inappropriate Comment to Plaintiff

In late March 2008, Plaintiff got up from her desk to walk to a co-worker's desk to ask about taking a break.  Dean said to Plaintiff, "[W]hat are you doing up out [of] your seat, my slave.  Where's your shackles[?]" (Pl. Dep. 215-16).  Plaintiff said, "excuse me.  What did I hear

3

you say[?]" (*Id.* at 216). Dean repeated herself. As an African-American, Plaintiff took offense to the comment. Dean testified that the comment was not based on Plaintiff's race, but was a reference to a "Dilbert" comic strip jokingly characterizing "employees being shackled to their desks as slaves to corporate America." (Dean Decl. ¶ 6). Dean's comment upset Plaintiff, and Plaintiff left the area because she was concerned she would say or do something she would regret.

A week later, Plaintiff met with human resources manager Ron Jones to discuss Dean's comment. Jones took a statement from Plaintiff, who described the incident, including reporting that Dean immediately told Plaintiff that she was just kidding in making the comment. Plaintiff also indicated that, on the day before she met with Jones, Dean approached her with a report showing errors she allegedly made during the first quarter of 2008. Jones promptly investigated the incident reported by Plaintiff. Jones met with two employees Plaintiff identified as witnesses to the incident, and he met with Dean. As a result of Jones' investigation, a written warning, dated April 16, 2008, was issued to Dean, expressly warning her that any future demeaning or unprofessional comments could result in further corrective action up to and including termination of employment. Dean was required to complete diversity training. On April 21, 2008, Jones informed Plaintiff that his investigation of the incident had been completed and that appropriate action had been taken. After Dean was issued the written warning, she did not say anything to Plaintiff that Plaintiff considered to be racially offensive.

### D. Plaintiff Applies for Position in Louisiana

On April 2, 2008, which was two days before Plaintiff complained to Jones about Dean's comment, Plaintiff applied for a Loan Operations Reviewer position in Chase's Custody Services

Department in Monroe, Louisiana.  Plaintiff wanted to work in Louisiana because she disliked Ohio weather and wanted to moved to a warmer climate.  However, because Plaintiff did not meet at least one of the requirements for the Louisiana position (2 years of banking experience), she was not hired for the position.

### E.    Plaintiff's Performance After Dean Resigns

On April 30, 2008, Dean resigned from Chase.  She was rehired as an Associate in the Home Equity Insurance Department in October 2009.  Although Dean was rehired by Chase in October 2009, she had no supervisory authority over Plaintiff after resigning in April 2008. After Dean's resignation in April 2008, Lafayette directly supervised Plaintiff until around June 2008, when Tamika Phillip became Plaintiff's supervisor.  When Lafayette directly managed Plaintiff's team, she had discussions with Plaintiff and her coworkers regarding their job performance.  When Phillip was Plaintiff's supervisor, she discussed job performance issues with Plaintiff, such as Plaintiff's communication style and processing and balancing errors. Phillip had similar conversations about job performance with other Operation Specialists reporting to her.  Despite making errors, Plaintiff did not receive any type of written corrective action for performance.

In August 2008, Plaintiff told Phillip that one of her coworkers, Michelle Cruz, who is Caucasian, had improperly assigned errors to her on the July 2008 ACH return.  Phillip informed Plaintiff that any ACH errors for July 2008 would not be counted against her or any other Operations Specialists on the team because the errors had not been confirmed based on back-up documentation.  Phillip asked Plaintiff to cite an example of an error that she believed Cruz had improperly assigned to her.  Phillip then reviewed the example Plaintiff provided to her and

determined that Plaintiff had in fact made the error.  Phillip shared this information with

Plaintiff, who told her that she believed Cruz was assigning errors to her in retaliation for her

complaint about Dean.  In view of Plaintiff's concerns regarding Cruz, combined with Phillip's

determination that Cruz had made multiple mistakes in assigning errors to all of the Operations

Specialists on her team, she and Lafayette decided to relieve Cruz of the task of assigning errors

on the return reports to her colleagues.

　　　For her 2008 year-end performance review, Plaintiff received a "meets expectations"

rating from Phillip.  Phillip noted, however, that Plaintiff needed to improve her communication

style and tone, which was at times unprofessional and disruptive to the work environment.

Phillip also encouraged Plaintiff to improve accuracy and minimize errors in the processing of

ACH requests.  Plaintiff received a merit pay increase at the end of 2008.

　　　**F.　　Plaintiff Requests Family Medical Leave Act leave and Short-Term
　　　　　　 Disability Leave in 2008**

　　　Beginning in March 2008, Plaintiff took intermittent leave under Chase's Family Medical

Leave Act ("FMLA") Policy for migraine headaches.  Plaintiff's leave was initially approved for

6 months, through September 2008, subject to recertification.  In October 2008, Plaintiff's

intermittent leave was recertified and continued without any lapse from September 2008 through

March 2009.  Every time Plaintiff requested intermittent leave for her migraines, Chase approved

the request.

　　　In August 2008, Plaintiff spoke with a representative in Chase's Disability Management

Services department, which handles all employee requests for leave and administers Chase's

short-term disability benefits plan.  Plaintiff requested leave for "stress" under Chase's

applicable policies.  Because Plaintiff sought leave for a mental health condition, the applicable

plan required Plaintiff to be treated by a licensed mental health provider, and for her to submit a

health care provider medical certification from the provider in support of her request for short-

term disability benefits.  Pending receipt of the required medical certification, Disability

Management Services preliminarily designated Plaintiff's request for leave as covered under the

FMLA.  Disability Management Services advised Plaintiff that her FMLA leave would run

concurrently with any short-term disability leave under Chase's policies.

　　　Plaintiff then submitted a certification report from her mental health care provider, Darla

White, who is a licensed professional clinical counselor.  White diagnosed Plaintiff with

adjustment disorder anxiety due to stress at work, noting Plaintiff as having the following

symptoms impacting her ability to work: severe headaches, fear of outbursts, sleep disruption,

and stress/anxiety affecting ability to concentrate.  White completed the work assessment section

of the certification.  White opined that Plaintiff had no impairment in her ability to work on her

own, to maintain an appropriate work pace, and to perform her tasks until completion.  White

also noted that Plaintiff had moderate impairment in her ability to relate to others, to get along

with peers, to manage customer requests, to follow directions, and to complete complex tasks.

White determined that Plaintiff had severe impairment in her capacity for impulse control and

her ability to manage ongoing work expectations.

　　　Disability Management Services retains a panel of health care professionals to review

requests for FMLA leave and paid short-term disability benefits.  An employee's supervisor has

no input into any decision to grant or deny FMLA leave and/or paid short-term disability

benefits.  Paul Pendler, Psy.D., reviewed the medical certification completed by White for

Plaintiff. Dr. Pendler concluded that his certification was insufficient to support Plaintiff's application for paid short-term disability benefits because it did not set forth objective medical findings showing that Plaintiff was unable to work, which is required for paid short-term disability benefits eligibility. Based on that determination, Chase denied Plaintiff's application for paid short-term disability benefits. Chase approved Plaintiff's request for FMLA leave through September 21, 2008. Despite having FMLA leave approved through September 21, 2008, Plaintiff returned to work on September 2, 2008.

On September 11, 2008, Plaintiff appealed the denial of her application for paid short-term disability benefits. In support of the appeal, Plaintiff submitted additional documentation to Chase, including a letter from White and medical records from her family physician, Joseph Lutz, M.D. White's letter indicated that Plaintiff's anxiety symptoms made "it difficult for her to go to work each day." (Pl. Dep., Ex. 20). Disability Management Services' appeals committee reviewed Plaintiff's appeal. Peggy Hullinger, Ph.D., reviewed the materials and determined that the denial of Plaintiff's application for paid short-term disability benefits was appropriate. Based on the medical record, and Dr. Hullinger's review of the materials, the appeals committee upheld the denial of Plaintiff's application for paid short-term disability benefits, concluding that there were no objective findings to support short-term disability leave.

### G. Plaintiff is Promoted and Transferred

In December 2008, Plaintiff was promoted and transferred to work as a Risk Analyst in Chase's Court Order and Levies Department. As a Risk Analyst, Plaintiff's duties included fielding incoming calls from customers whose accounts had been placed on hold due to collection actions. Plaintiff would provide the customers with contact information for attorneys

8

and court personnel to help answer their questions.  Plaintiff's new supervisor was Matt Wolfe.
Plaintiff performed well in her new position.  In 2009 and 2010, Plaintiff met Wolfe's
performance expectations.  Plaintiff received merit pay increases in 2009 and 2010, and she was
Wolfe's top performer for March 2010.  Wolfe never made any comments about Plaintiff's age,
medical conditions, or race, and Plaintiff never complained to Chase about any perceived
discrimination by Wolfe.

  **H.**  **Plaintiff Receives FMLA Leave and Short-term disability Benefits in 2010**

  Under Chase's FMLA policy, Plaintiff was eligible for 12 weeks, or 480 hours, of job-
protected leave during a 12-month period.  Chase's FMLA policy allows eligible employees to
take up to 12 weeks of job-protected leave in a backward-rolling 12 months period for a number
of qualifying reasons, such as an employee's own serious health condition.  Between March 5,
2010, and September 2, 2010, Plaintiff used 60 hours of intermittent leave for migraine
headaches, which left her with 420 hours of available FMLA leave through March 2011.
Beginning September 3, 2010, Plaintiff was unable to work due to migraine headaches, panic
attacks, panic disorder, and stress.  Plaintiff requested continuous FMLA leave and applied for
paid short-term disability benefits through October 11, 2010.  In support, Plaintiff submitted a
health care provider medical certification, which was completed by Kay Ackerman-Martin, a
licensed professional clinical counselor, and a medical certification completed by Dr. Lutz.
Ackerman-Martin opined that Plaintiff had severe impairment in all of her work functions.
Based on the documentation submitted, Disability Management Services approved Plaintiff's
request for short-term disability benefits and FMLA leave, which ran concurrently.

  In September 2010, while Plaintiff was on leave, a mistake was made with respect to one

of her paychecks.  The paycheck was deficient by one day's worth of pay.  Plaintiff brought the

issue to Wolfe's attention.  Wolfe told Plaintiff that he fixed it, and payroll issued an off-cycle

check to Plaintiff in the amount of the previous deficiency.

In early October 2010, Plaintiff submitted a recertification request form from Dr. Lutz to

support her request for additional FMLA leave and paid short-term disability benefits.  The form

indicated that Plaintiff would be unable to return to work until November 1, 2010.  In view of the

recertification, Disability Management Services extended Plaintiff's FMLA leave and paid short-

term disability benefits through November 14, 2010.  As of October 6, 2010, Plaintiff had 228

hours of FMLA leave available to her through March 2011.

On around November 15, 2010, Plaintiff submitted another recertification request form

from Dr. Lutz, who estimated that she would be unable to return to work until December 6,

2010.  Disability Management Services extended Plaintiff's FMLA leave and paid short-term

disability benefits through December 5, 2010.

### I.     Plaintiff Returns to Work and Again Applies for Leave

On December 6, 2010, Plaintiff returned to work without any medical restrictions.  As of

that date, Plaintiff had exhausted all of her available leave time (12 weeks or 480 hours) under

Chase's FMLA policy.  Under the policy, she would not accrue additional FMLA hours until

March 2011.

At the conclusion of 2010, Plaintiff received her performance review for the year.  Wolfe

again rated Plaintiff's overall performance as "meets expectations," and she received another

merit pay increase.

After Plaintiff returned to work in December 2010, she approached manager Shari

10

Lambert and supervisor Beth McNaulty, who worked for Chase in processing, about her desire

to move in their area.  McNaulty informed Plaintiff that there would be multiple job openings in

January 2011.  Plaintiff testified that she told Lambert or McNaulty that she needed to move

positions because of a medical condition that she had.  However, she also acknowledged that she

did not submit any medical documentation to Chase indicating that she needed to be in a

different position because of her medical condition.

Plaintiff's inquiry into a possible transfer was cut short when she went back on medical

leave on January 21, 2011, for the same medical reason for which she sought leave in

2010–migraine headaches, panic attacks, and anxiety.  Based on the medical documentation that

Plaintiff submitted to Chase, Disability Management Services granted Plaintiff's request for

FMLA leave and application for paid short-term disability benefits from January 21, 2011,

through April 19, 2011.  Because Plaintiff had been back to work for only a short period of time,

Chase considered her January 2011 leave as a continuation of her 2010 leave under its disability

leave policy.

Sometime in March 2011, Plaintiff questioned whether her recent pay increase was

properly applied based on her review of her pay statements.  A Chase payroll officer contacted

Plaintiff, explained the calculations reflected on the pay statements, and assured her that she was

paid at the correct hourly rate.

### J.    Chase Posts Plaintiff's Position and Places Her on Inactive Status Pending Her Request for Long-Term Disability Benefits

When Plaintiff took medical leave in January 2011, she had already exhausted her 12-

weeks of available leave time under Chase's FMLA policy.  Thus, under Chase's policy, her job

was no longer protected during her continued absence from work.  On February 2, 2011, Chase Human Resources Business Partner Kai Craig talked with Plaintiff regarding the exhaustion of her job-protected leave time under Chase's FMLA policy.  Craig advised Plaintiff that, based on the needs of the business, her job was being posted.  The next day, Craig sent a letter to Plaintiff confirming their conversation that Plaintiff's position had been posted.

Under Chase's Disability Leave Policy, employees may take up to 26 weeks of paid time off (short-term disability benefits) from work while seeking treatment for mental and/or physical injuries and illnesses.  Leave under the Disability Leave Policy runs concurrently with any leave received under Chase's FMLA Policy.  On about April 19, 2011, Plaintiff exhausted her available short-term disability leave benefits.  Chase then placed Plaintiff on inactive status because she was no longer on any type of approved leave.

In May 2011, Plaintiff applied for long-term disability leave benefits.  Under Chase's Long-Term Disability Plan, third-party insurers administer and make all decisions regarding an employee's eligibility for long-term disability benefits.  The Hartford Life and Accident Insurance Company ("Hartford") administered the Long-Term Disability Plan through the end of 2010, and the Prudential Insurance Company of America ("Prudential") became the plan administrator on January 1, 2011.  Hartford informed Plaintiff that because she did not have long-term disability coverage in 2010 when it was administering the Long-Term Disability Plan, it could not evaluate her claim for benefits and she would need to pursue her claim with Prudential.  Prudential denied Plaintiff's application for long-term disability benefits because it determined that her condition was pre-existing and therefore excluded from coverage and because the medical information did not support impairment that would prevent Plaintiff from

12

performing material and substantial duties of her own occupation.  Chase did not make the decision to deny Plaintiff's claim for long-term disability leave benefits.

### K.     Chase Terminates Plaintiff's Employment

On September 21, 2011, Craig talked with Plaintiff regarding her employment status. Plaintiff told Craig that she knew that her application for long-term disability leave benefits had been denied.  Plaintiff also told Craig that she had not been released by her doctor to work.  It is Chase's practice to terminate an individual's employment if the employee is off work, is not on an approved leave (because he or she has exhausted all available leave time), has no leave request pending for approval, and has no expected return-to-work date.  Because Plaintiff's situation met these criteria, Craig advised Plaintiff that her employment would be terminated, effective September 21, 2011, unless she was approved for additional unpaid leave time under Chase's Disability and Reasonable Accommodation Policy.  Plaintiff did not seek additional leave.  Consequently, her employment was terminated effective September 21, 2011.

### L.     Procedural History

In December 2009, *pro se* Plaintiff Lynda Reddy initiated an employment discrimination action against Defendants JPMorgan Chase Bank, N.A. ("Chase"), Nicole Lafayette, and Stacey Dean (collectively "Defendants"), which was docketed as Case No. 2:09-cv-1152.  In October 2011, Plaintiff initiated a second employment discrimination action against Chase, which was docketed as Case No. 2:11-cv-879.  Because Case No. 2:09-cv-1152 and Case No. 2:11-cv-879 contain common issues of law and fact, the Court consolidated the two actions in December 2011 and ordered that all future filings be filed in Case No. 2:09-cv-1152 (Doc. 61).  In both cases, Plaintiff asserted a multitude of employment-related claims under Federal and Ohio law.

13

Defendants filed partial Motions to Dismiss in both cases, which were granted (Docs. 43 and 65).

Based on the previous dismissals, the following claims remain pending: (1) race discrimination under Ohio law (as to Defendants Chase, Lafayette, and Dean); (2) retaliation under Ohio law (as to Chase, Lafayette, and Dean); (3) disability discrimination under Ohio law (as to Chase and Lafayette); (4) failure to accommodate disability discrimination under Ohio law (as to Chase); (5) race discrimination under Title VII (as to Chase); (6) age discrimination under the ADEA (as to Chase); (7) disability discrimination under the ADA (as to Chase); (8) retaliation under Title VII (as to Chase); (9) hostile work environment race harassment under Ohio law (as to Chase); (10) interference and retaliation under the FMLA (as to Chase); (11) wrongful denial of short-term disability benefits and long-term disability benefits under ERISA (as to Chase); and, (12) wrongful termination based on discrimination or retaliation under Ohio law (as to Chase).

In October 2012, Defendants filed their Motion for Summary Judgment as to all of Plaintiff's remaining claims. In November 2012, Plaintiff untimely filed her own Motion for Summary Judgment. In response to Plaintiff's motion, Defendants moved to strike the motion. In March 2013, the Court granted Defendants' Motion to Strike (Doc. 88). In granting the Motion to Strike, the Court rejected Plaintiff's attempt to characterize her Motion for Summary Judgment as a timely response to Defendant's Motion for Summary Judgment. However, the Court provided Plaintiff with an opportunity to file a new document directly responsive to Defendants' Motion for Summary Judgment, and the arguments contained therein. The Court set a deadline of April 22, 2013, for Plaintiff to file her response to Defendants' Motion for

14

Summary Judgment.  That date has come and gone and Plaintiff has not filed a response. Although the Court recognizes that Plaintiff is proceeding *pro se*, *pro se* litigants are held to the same standards as other litigants when it comes to easily understood deadlines, rules, and procedures.  *See Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).  Therefore, Defendants' Motion for Summary Judgment is ripe for review.

## II.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party.  *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

15

that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*,  570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions

16

of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

As noted above, Plaintiff has not filed a response to Defendants' Motion for Summary Judgment. Even where a summary judgment motion is uncontested, a court is not permitted to merely enter judgment in the moving party's favor. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998) (finding that "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded."). Instead, the court may grant summary judgment only if, after a close examination of the motion and the documents in support, the court determines that no genuine issue of material fact remains. *Id.*; *Turner v. FMC*, 23 F. App'x 415, 417 (6th Cir. 2001).

## III. DISCUSSION

As set forth above, Defendants' Motion for Summary Judgment addresses Plaintiff's claims that remain pending in this action. Because they involve similar issues, the Court will generally address together Plaintiff's claims of race, age, and disability discrimination or retaliation, and Plaintiff's claim of FMLA retaliation. The Court will separately address Plaintiff's failure to accommodate claim. Then the Court will address Plaintiff's claim of hostile work environment racial harassment. Next, the Court will address Plaintiff's claim of FMLA interference. Finally, the Court will address Plaintiff's ERISA claims.

### A. Claims of Race, Age, or Disability Discrimination or Retaliation

Plaintiff alleges that she was subjected to numerous adverse employment actions on the basis of her race, age, disability status, or because she availed herself of a protected right under the FMLA. Plaintiff does not purport to offer direct evidence of discrimination or retaliation;

17

instead, she seeks to demonstrate the unlawful conduct indirectly.  Thus, her discrimination and

retaliation claims must be evaluated under the three-part *McDonnell Douglas* burden-shifting

framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973); *see also*,

*Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.1 (6th Cir. 2010) (holding

that age discrimination claims based on circumstantial evidence are analyzed under *McDonnell*

*Douglas*); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) (applying

*McDonnell Douglas* to plaintiff's FMLA retaliation claim).

 Under the *McDonnell Douglas* test, if the plaintiff establishes a *prima facie* case, then the

burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for

the adverse action against the plaintiff.  *See id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450

U.S. 248, 252–53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory

reason for its actions, then the burden returns to the plaintiff to prove that the defendant's

proffered reason is a mere pretext for discrimination.  *See id.*; *Burdine*, 450 U.S. at 253.  "The

nature of the burden that shifts to the defendant should be understood in light of the plaintiff's

ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Id.* at 253.  This burden-shifting framework is intended to be flexible in differing factual

circumstances.  *See, e.g.*, *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 869–70 (6th Cir.

2001), citing *Burdine*, 450 U.S. at 254 n.6.

 Discrimination and retaliation claims brought under Ohio law are analyzed in the same

manner as discrimination and retaliation claims brought under federal law.  *Brenneman v.*

*MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Greene v. St. Elizabeth Hospital*

*Medical Center*, No. 96–4308, 1998 WL 13410 at *5 (6th Cir. Jan.7, 1998); *Plumbers &*

*Steamfitters Joint Apprenticeship Comm. v. Oh. Civil Rights Comm'n*, 421 N.E.2d 128, 131-32

(Ohio 1981).

To establish a *prima facie* case of employment discrimination or retaliation based on

race, disability, age, or plaintiff's protected conduct, the plaintiff must present evidence

demonstrating, *inter alia*, that the defendant subjected the plaintiff to an "adverse" employment

action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) (setting forth elements

to show race discrimination); *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir.

2004) (setting forth elements to show disability discrimination); *Martin v. Toledo Cardiology*

*Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2009) (setting forth elements to show age

discrimination and retaliation); *Davis v. Wayne State Univ.*, No. 11–10324, 2011 U.S. Dist.

LEXIS 76909 (E.D. Mich. July 15, 2011) (setting forth elements to show FMLA retaliation).

The Sixth Circuit has held that in order to be "adverse," the employer's actions must be

"materially adverse." *See, e.g.*, *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir.

2000) (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). That is, the actions at

issue "must be more than a mere inconvenience or an alteration of job responsibilities." *Id.* For

example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a

less distinguished title, a material loss of benefits, [or] significantly diminished material

responsibilities" might qualify as a materially adverse action. *Id.* But "*de minimis* employment

actions are not materially adverse." *Bowman*, 220 F.3d at 462 (quoting *Hollins*, 188 F.3d at

662).

Plaintiff bases her discrimination and/or retaliation claims on the following alleged

19

adverse employment actions of Defendants: Dean and Lafayette approaching her in 2008 regarding errors on the ACH report and other feedback she received regarding her communication style and interactions with others; a mistake with her paycheck when she was on leave in September 2010, which was promptly corrected; an alleged error with her paycheck in February 2011; the denial of her application for long-term disability benefits in 2011; the denial of her 2008 application for a position in Monroe, Louisiana; the denial of her application for paid short-term disability benefits in 2008; not receiving what she considered to be a sufficient pay raise in 2011; and, her termination in September 2011. As set forth below, the Court finds that the first four of these employment actions do not constitute an "adverse" employment action that may form the basis of a claim of discrimination or retaliation.

Plaintiff suggests that her discussions with Lafayette and Dean in 2008 were based on incorrect error reporting and therefore constituted an adverse employment action. Even though Plaintiff had discussions with Lafayette and Dean about her alleged errors in 2008, the discussions did not lead to formal corrective action being improperly taken against Plaintiff. Plaintiff raised concerns regarding the accuracy of the reports, and Lafayette addressed those concerns. The disputed errors were not used in the evaluation of Plaintiff's performance. Plaintiff does not allege that her pay was reduced or that she lost any benefits as a result of the discrepancies in the 2008 reports. Plaintiff was promoted in December 2008, and also received a merit pay increase for her work in 2008. Therefore, there was no adverse employment action taken in connection with the 2008 performance discussions.

In September 2010, and while Plaintiff was on leave, she received a paycheck that was deficient by one day's worth of pay. Plaintiff brought the issue to the attention of her supervisor,

and payroll issued an off-cycle check to Plaintiff in the amount of the deficiency.  The Sixth

Circuit has determined that a short delay in the payment of one-day's worth of pay does not rise

to the level of an adverse employment action.  *See Plautz v. Potter*, 156 F. App'x 812 (6th Cir.

2005) ("the postponement of one-day's pay for one pay period had only a negligible impact on

[an employee's] income and does not rise to the level of an adverse employment action."); *Cf.*

*White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 802 (6th Cir. 2004) (holding that

taking away an employee's wages for one month, even though it was later reinstated, rises to the

level of an adverse employment action).  Thus, the September 2010 pay error was not an

actionable adverse employment action.

After Plaintiff received a merit pay increase to begin 2011, she questioned whether she

was being paid at the correct hourly rate for pay periods occurring in February 2011.  Plaintiff

contacted the Human Resources Department at Chase with the position that her hourly rate

increase was not reflected in the February 2011 pay periods.  A payroll officer contacted Plaintiff

and explained the information on the pay statements, assuring her that the hourly rate increase

was reflected in her pay.  Plaintiff fails to present any evidence showing that she was in fact not

properly compensated.  Thus, Plaintiff cannot show any adverse action was taken against her in

relation to her compensation for the February 2011 pay periods.

Plaintiff alleges that Chase discriminated and retaliated against her by unlawfully

denying her long-term disability benefits in 2011.  Under Chase's Long-Term Disability Plan,

third-party insurers administer and make all decisions regarding an employee's eligibility for

long-term disability benefits.  Hartford administered the Long-Term Disability Plan through the

end of 2010, and Prudential administered the Long-Term Disability Plan in 2011.  Hartford

advised Plaintiff that she had no long-term disability coverage in 2010 and that Prudential

administered the Long-Term Disability Plan in 2011.  Prudential denied Plaintiff's application

for long-term disability benefits.  Because Chase did not make the decision to deny Plaintiff's

claim for long-term disability leave benefits, it took no adverse employment action against her as

it relates to the denial of her application for long-term disability benefits.

All four of the remaining employment actions cited by Plaintiff constitute adverse

employment actions that may form the basis of a discrimination or retaliation claim.  These

employment actions involve the denial of Plaintiff's application for short-term disability benefits

in 2008, the denial of her application to be placed in a position in Louisiana, the amount of her

pay raise in 2011, and her ultimate termination from employment in September 2011.  However,

even assuming Plaintiff meets all the other requirements for establishing a *prima facie* case as it

relates to these employment actions, Chase has presented evidence of a legitimate, non-

discriminatory reason for each of these actions.  And Plaintiff presents no evidence of pretext.

In April 2008, Plaintiff applied for an employment position in Chase's Custody Services

Department in Monroe, Louisiana.  She was not hired for this position, and Plaintiff alleges that

Chase unlawfully discriminated or retaliated against her when it rejected her for this position.

But Chase had a legitimate, non-discriminatory reason for not transferring Plaintiff to the

position in Louisiana.  Namely, Plaintiff was not qualified for the position because she did not

meet at least one of the requirements for the position.

Plaintiff alleges that Chase's denial of her application for short-term disability benefits in

2008 was based on discrimination and retaliation.  However, Chase had a legitimate, non-

discriminatory reason for denying Plaintiff's application for paid short-term disability benefits.

22

Chase's expert concluded that the documentation submitted in support of her application did not set forth objective medical findings showing that Plaintiff was unable to work, which was required for her to qualify for short-term disability benefits.  This conclusion had a basis in fact, as the certification report of Plaintiff's health care provider indicated in part that Plaintiff had no impairment in her ability to work on her own, to maintain an appropriate work pace, and to perform her tasks until completion.  This initial determination was appealed, but the reviewing committee reasonably determined that Plaintiff had not met her burden in showing an inability to work.

Plaintiff contends that she should have received a greater pay raise in 2011 than the 2% increase she received for meeting her employer's expectations.  In essence, she asserts that she was treated adversely in not receiving a greater pay raise.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008) (noting that a lower salary increase than otherwise deserved constitutes adverse action).  Even assuming Chase's decision not to give Plaintiff a larger pay increase constitutes an adverse employment action, Chase presents a legitimate, non-discriminatory reason for not giving Plaintiff a higher salary increase.  For the year 2011, Plaintiff's overall performance was rated as "meets expectations."  A 2% salary increase is consistent with such a performance rating.

Finally, Plaintiff alleges discrimination and retaliation claims based on her termination from employment in September 2011.  These claims also fail because Chase has presented a legitimate, non-discriminatory reason for Plaintiff's termination.  Plaintiff had exhausted all of her available leave time, she was unable to work as of September 2011, and she did not seek additional leave as an accommodation.  In view of these circumstances, Chase acted reasonably

23

in terminating Plaintiff's employment.

Plaintiff has not presented evidence showing that any of the proffered reasons given for the above-discussed adverse employment actions was pretextual, and that the real reason was based on an illegal animus.  Consequently, Plaintiff's claims of employment discrimination or retaliation based on race, disability, age, or plaintiff's protected conduct, all fail.

**B.    Failure to Accommodate Disability Discrimination Claim**

Plaintiff alleges that Chase should have transferred her to a different position in view of her medical situation.  In order to establish a *prima facie* case of disability discrimination under the Americans with Disabilities Act ("ADA") for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.  *Myers v. Cuyahoga Cnty.*, 182 F. App'x 510, 515 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)).  In addition to actually having a disability, a plaintiff must request an accommodation and a defendant must receive notice, either actual or constructive, that the plaintiff's request is linked to a disability.  *See Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp.2d 814, 828 (S.D. Ohio 2004) (Marbley, J.) ("[A] person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability.").  If a plaintiff seeks a workplace transfer as an accommodation, then the plaintiff must show a vacancy for which she is qualified.  *Steward v. New Chrysler*, 415 F. App'x 632, 643 (6th Cir. 2011).

When Plaintiff returned to work in December 2010, she approached manager Shari

Lambert and supervisor Beth McNaulty, who worked for Chase in processing, about her desire to move in their area.  McNaulty informed Plaintiff that there would be multiple job openings in January 2011.  Plaintiff allegedly told Lambert or McNaulty that she needed to move positions because of a medical condition that she had.  But she did not submit any medical documentation to Chase indicating that she needed to be in a different position because of her medical condition. Plaintiff went on medical leave on January 21, 2011, clearly impacting her ability to transfer to a new position.  Furthermore, Plaintiff has not shown that she was actually qualified for any position that opened in January 2011.  For these reasons, Plaintiff's failure to accommodate disability discrimination claim fails.

### C.     Hostile Work Environment Claim

Plaintiff alleges that Dean's comment to her about being Dean's "slave" created a hostile work environment.  Chase argues that Plaintiff cannot establish actionable harassment, and that, even if she could, it has an affirmative defense to liability because it exercised reasonable care to prevent and correct promptly any harassing behavior, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Chase or to avoid harm otherwise.

To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on her protected class; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.  *Grace v. USCAR*, 521 F.3d 655, 678 (6th

Cir. 2008).

Plaintiff's hostile work environment claim fails because she has not presented evidence of conduct that is sufficiently severe or pervasive to be actionable under the law.  A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted); *Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999).  Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive.  *Harris*, 510 U.S. at 21-22.  Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Here, there is evidence that Dean said to Plaintiff, "[W]hat are you doing up out [of] your seat, my slave.  Where's your shackles[?]"  (Pl. Dep. 215-16).  Plaintiff said, "excuse me.  What did I hear you say[?]"  (*Id.* at 216).  Dean repeated herself.  Plaintiff took offense to Dean's comment, given its racial undertones.  However, other than this isolated statement, Dean did not say anything else to Plaintiff that she considered to be race based.  While Dean has testified that the statement was not racially motivated but was a reference to a joke about corporate America made in a comic strip, the statement reasonably could be viewed as racially offensive.  But her comment did not sufficiently affect conditions of employment to be actionable under the law.  Simply stated, Dean's comment can only be viewed as isolated and not sufficiently severe or

26

pervasive to create a hostile work environment.  In fact, the Sixth Circuit has held that racial slurs and conduct far more offensive than anything alleged by Plaintiff still falls short of that necessary to create an actionable hostile work environment.  *See, e.g., Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000).[1]

Therefore, Plaintiff cannot establish a *prima facie* case of hostile work environment based on racial harassment, and it is unnecessary to address Chase's affirmative defense to liability.

### D.    FMLA Interference Claim

The FMLA entitles "an eligible employee to take not more than 12 weeks of unpaid leave, or substituted paid leave, for reasons that include a serious health condition that makes the employee unable to perform the functions of his position."  *Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 482 (6th Cir. 2010) (citing 29 U.S.C. 2612(a) and (d)). Under the Act, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]."  29 U.S.C. § 2615(a)(1).  To establish an interference claim under the FMLA, Plaintiff must prove that: (1) she is an "eligible employee" under the FMLA (2) Defendant was covered under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave Defendant notice of her intention to take leave, and (5) Defendant denied the FMLA benefits or interfered with FMLA rights to which she was entitled. *See Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 720 (6th Cir. 2003).

---

[1] In *Smith*, the plaintiff testified that his coworkers and supervisors regularly made racially discriminatory comments and racially-motivated threats in his presence and circulated a crass cartoon captioned "How a Black Man Commits Suicide" around the plant.  Yet the Sixth Circuit reversed the jury's verdict for the plaintiff, holding that the conduct was "simply not 'severe or pervasive enough' to create an objectively hostile work environment."  *Id.* at 760.

Plaintiff does not allege that Chase denied her any FMLA benefits to which she was entitled.  Plaintiff concedes that Chase approved every one of her requests for FMLA leave. Plaintiff argues, however, that Chase interfered with her FMLA rights by delaying her receipt of FMLA recertification paperwork.  Plaintiff also contends that she was erroneously advised in November 2010 that her leave time was exhausted, when it was not.  These arguments are meritless.

Plaintiff has not presented evidence showing that Chase denied her FMLA benefits or interfered with FMLA rights to which she was entitled.  While there was an initial delay in Plaintiff receiving her FMLA recertification paperwork after she requested it, she timely received it, and there was no delay in the processing of her recertification request.  Thus, there was no loss in FMLA benefits because Plaintiff's intermittent FMLA leave request was approved without any lapse in coverage.  Furthermore, while Plaintiff asserts that she received erroneous information about the exhaustion of her FMLA leave, the receipt of such information, standing alone, does not amount to a violation of the FMLA.  *See Denton v. Fairfield Medical Center*, No. 2:11-cv-716, 2012 WL 2409224 (S.D. Ohio June 26, 2012) (Smith, J.) (finding that erroneous advisement regarding exhaustion of FMLA leave does not, standing alone, amount to a denial of benefits).  Plaintiff does not allege that she was denied FMLA benefits, or was deterred from applying for FMLA benefits, based on an allegedly erroneous calculation.  In fact, Chase presents unrebutted evidence that Plaintiff was provided more than 12 weeks of FMLA leave before it posted her position and terminated her employment.  Because Plaintiff does not show that she was denied or lost any FMLA benefits or rights to which she was entitled, her FMLA interference claim fails as a matter of law.

28

E.      ERISA Claims

Plaintiff alleges that Chase wrongfully denied her 2008 request for short-term disability leave benefits and her request for long-term disability leave benefits.  Chase argues that Plaintiff cannot establish that the denial of her 2008 request for short-term disability leave benefits was arbitrary or capricious.  Chase also argues that because it did not control administration of the long-term disability plan, it is not the proper defendant as to Plaintiff's claim concerning long-term disability leave benefits.

Plaintiff's claim for benefits is governed by ERISA.  Section 502(a)(1)(B) of ERISA gives Plaintiff the right, as a benefit plan participant, to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A court reviewing an administrator's decision to deny benefits under a plan governed by ERISA is to apply a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115 (1989).

In the case at bar, the applicable benefit plan vests discretion in the plan administrator and its representatives.  Chase's Health & Income Protection Program (the "Program") sets forth the general terms governing Chase's health and income benefit plans, including plans governing short-term disability and long-term disability benefits.  Under the Program, benefits under a plan "will be paid only if the Program Administrator or its delegate decides in its discretion that a Participant is entitled to them."  (Quick Decl., Ex. A, ¶ 4.2).  Additionally, the Program Administrator or its delegates have the authority to "construe the Program and individual Plans

29

subject to their provisions" and to "decide, at its sole discretion, all questions arising in the interpretation of the Program and each individual Plan, including questions concerning eligibility and whether to grant or deny benefits[.]" *Id.* at ¶ 4.2(vi).  As applicable here, Chase's short-term disability plan identifies Disability Management Services as the claims evaluator for the plan. Thus, the benefit plan gives discretionary authority to the administrator (Disability Management Services) in determining eligibility for benefits and interpreting the terms of the plan, and therefore the "arbitrary and capricious" standard is appropriate.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).  Under the arbitrary and capricious standard, a determination by the plan administrator will be upheld if it is rational in light of the plan's provisions.  *Id.*; *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).  When it is possible to offer a reasoned explanation for a plan administrator's decision based upon the evidence, that decision is not arbitrary and capricious.  *McDonald*, 347 F.3d at 169; *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989).  The arbitrary and capricious standard, however, "does not require us merely to rubber stamp the administrator's decision."  *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation omitted).  The Court is "entitled to take into account the existence of a conflict of interest that results when . . . the plan administrator who decides whether an employee is eligible for benefits is also obligated to pay those benefits . . . ." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006).  Moreover, the Sixth Circuit has instructed: "to the extent that the [Plan's] language is susceptible of more than one interpretation, [a court should] apply the 'rule of *contra proferentum*' and construe any ambiguities against . . . the

drafting parties." *Univ. Hosp. of Cleveland*, 202 F.3d at 846-47 (citing *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998)).

In the case at bar, Chase did not abuse its discretion in denying Plaintiff's request for short-term disability leave benefits in the fall of 2008.  In support of Plaintiff's application for short-term disability benefits in the fall of 2008, she submitted a certification report of her mental health care provider, Darla White, a licensed professional clinical counselor.  White opined that while Plaintiff had severe impairment in her capacity for impulse control and her ability to manage ongoing work expectations, she had no impairment in her ability to work on her own, to maintain an appropriate work pace, and to perform her tasks until completion.  White also noted that Plaintiff had moderate impairment in her ability to relate to others, to get along with peers, to manage customer requests, to follow directions, and to complete complex tasks. Disability Management Services employee Paul Pendler, Psy.D., reviewed White's certification report and concluded that the report was insufficient to support Plaintiff's application for paid short-term disability benefits because it did not set forth objective medical findings showing that Plaintiff was unable to work, which is a prerequisite for paid short-term disability benefits under the applicable plan.

Plaintiff appealed the initial denial, and submitted additional documentation to Chase, including a letter from White and medical records from her family physician, Joseph Lutz, M.D. White's letter indicated that Plaintiff's anxiety symptoms made "it difficult for her to go to work each day," but it did not indicate that Plaintiff was completely unable to work.  Peggy Hullinger, Ph.D., reviewed the appeal and supporting documentation and concluded that denial of the application was appropriate due to the absence of objective data to support Plaintiff's position

that she was unable to work.  An appeals committee upheld the denial of Plaintiff's application

for paid short-term disability benefits, concluded that there were no objective findings to support

short-term disability leave.

It was neither arbitrary nor capricious for Chase to rely on Dr. Hullinger's review of

Plaintiff's medical records in denying her application for short-term disability benefits.  Dr.

Hullinger presented a reasoned explanation that was based on the evidence submitted by Plaintiff

for the denial of the application for short-term disability benefits.  Moreover, Plaintiff returned to

work full-time after her application for paid short-term disability benefits was denied, but during

the pendency of her appeal.  Thus, the Court finds that Chase did not abuse its discretion in

denying Plaintiff's request for paid short-term disability benefits during the fall of 2008.

Plaintiff's claim that Chase unlawfully denied her long-term disability benefits in 2011

also fails.  It is well-settled Sixth Circuit law that "[u]nless an employer is shown to control

administration of a plan, it is not a proper party defendant in an action concerning benefits."

*Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988); *see Wolff v. Life Ins. Co. of N. Am.*,

No. 92-1072, 1993 WL 84493 (6th Cir. 1993) (employer with no involvement in the decision to

deny benefits under an ERISA governed plan is not a proper party defendant in a suit for

recovery of benefits under ERISA).

Here, for Chase's Long-Term Disability Plan effective January 1, 2010, "The Hartford

Life and Accident Insurance Company" is named the claims administrator.  (Quick Decl., Ex. C

at 3).  The 2010 Long-Term Disability Plan states that "The Hartford, the claims administrator,

has complete authority to determine whether you've incurred a disability for which benefits are

payable under the Long-Term Disability Plan, and to administer the payment of any such

benefits." (*Id.* at Ex. C at 22).  Beginning in January 2011, Prudential became the Long-Term

Disability Plan administrator, assuming complete authority to administer the plan and to

determine whether benefits were payable under the plan.  Being the administrator of the Long-

Term Disability Plan in 2011, Prudential evaluated and denied Plaintiff's long-term disability

benefits request.  Because Chase did not control the administration of the 2011 Long-Term

Disability Plan, or otherwise make the decision to deny Plaintiff's application for long-term

disability benefits, it is not a proper defendant as to Plaintiff's claim for unlawful denial of long-

term disability benefits.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment (Doc. 78).  Final judgment shall be entered in favor of Defendants.

The Clerk shall remove Document 78 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 *s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**